## IN THE IOWA DISTRICT COURT IN AND FOR FRANKLIN COUNTY

| | |
|---|---|
| IOWA PORK PRODUCERS ASSOCIATION, LINN VALLEY PIGS LLP, TWIN PRAIRIE PORK, LLC, and NEW GENERATION PORK, INC., | |
| Plaintiffs, | Case No. CVCV501890 |
| v. | **AMENDED PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and TOMAS ARAGON, in his official capacity as Director of the California Department of Public Health, | |
| Defendants. | |

COME NOW Plaintiffs, Iowa Pork Producers Association, in its own right and in a representative capacity for its members, ("IPPA"), Linn Valley Pigs LLP ("LVP"), Twin Prairie Pork, LLC ("TPP"), and New Generation Pork, Inc. ("NGP") (collectively, "Plaintiffs"), by and through their counsel of record, and for their Amended Petition for Declaratory and Injunctive Relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), respectfully state to the Court as follows:

### INTRODUCTION

1.    This case challenges the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 12"), which imposes confinement

1

requirements on out-of-state pork producers and prohibits the sale of pork meat within the state of California from animals confined in a manner inconsistent with California's restrictions, regardless of where in the nation the animal was raised.

2.      Iowa is the leading pork producing state in the United States and is the top state for pork exports.

3.      Nearly one-third of the nation's hogs are raised in Iowa—more than twice the amount of its runner up—and Iowa has more than 5,400 hog farms, with producers in nearly every county.

4.      In 2020, Iowa sales for the pork industry including hog production totaled $40.8 billion. It also generated $893 million in state and local taxes and $1.3 billion in federal taxes.

5.      In 2020, Iowa had 960,000 breeding pigs and more than 22 million hogs and pigs total on Iowa farms.

6.      For these breeding pigs to come into compliance with Proposition 12 confinement restrictions, it will cost at least tens of millions of dollars for Iowa pork producers on an annual basis.

7.      The Iowa hog inventory has been growing at a rate of 3% annually for the past decade, compared to a 2% growth rate nationally in the United States market.

8.      As of 2017, 45% of farming operations in Iowa are on farms with between 1,000 and 5,000 hogs and pigs.

9.       The number of smaller farming operations in Iowa has been dwindling since 1997.

10.     Nearly 150,000 jobs within Iowa are associated with the Iowa pork industry, and nearly 1 in 10 working Iowans have a job tied to the pork industry.

11.     Estimates suggest California residents consume 13-15% of the pork consumed nationally in the U.S.

12.     Despite its behemoth status as a consumer of pork, California has only as few as 8,000 breeding pigs in the entire state. Only approximately 1,500 of these sows are used in commercial breeding in the state, and are situated in a handful of very small farms. This equates to California production making up less than 1% of the total U.S. pork production. If California were to meet its own in-state pork demand, it would require production from approximately 673,000 sows annually. In other words, California cannot feed itself without massive agricultural imports from other states, including, most importantly, from Iowa.

13.     In 2018, California voters passed Proposition 12. For the first time, California's previous confinement restrictions which regulated in-state producers only (the "Turn Around Requirements") were immediately imposed on *all* whole pork meat sold within the state of California, regardless of where the hog was raised. These Turn Around Requirements require that breeding pigs (sows) in California must be housed in a manner that permits the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions.

14.     The limited exceptions as applicable here include only the five-day period prior to the expected date of giving birth, during nursing, and for only temporary periods of less than six hours for breeding purposes.

15.     Proposition 12 went into effect December 19, 2018, as the California Constitution, Article II, Section 10, provides that unless a statute otherwise specifies a date, a ballot initiative "takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date."

16. Proposition 12's Turn Around Requirements do not have a separately specified effective date in the text and thereby arguably went into effect on December 19, 2018.

17. Proposition 12's 24 square foot restrictions' effective date is specified and goes into effect "after December 31, 2021." These separate restrictions state that a breeding pig is subject to a method of "cruel confinement" after December 31, 2021, if a breeding pig is confined with less than 24 square feet of usable floorspace per pig.

18. In short, Proposition 12 makes Iowa pork producers unable to sell their pork for consumption into California unless those out-of-state pork producers comply with both California's Turn Around Requirements and 24 square footage restrictions on and after January 1, 2022.

19. Proposition 12 imposes criminal penalties on any person found to be in violation of any provisions of the Act, with penalties of a fine of up to $1,000 or 180 days imprisonment. These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of non-compliant pork meat within California. Additionally, the sale of non-compliant pork meat qualifies as an unfair business practice under California law, and violators are separately subject to a $2,500 fine per violation under the state Consumer Protection statute.

20. The vast majority of Iowa pork producers are not currently in compliance with California's Turn Around Requirements or 24 square foot restrictions, and the estimated cost to come into compliance with these restrictions could reach millions of dollars for a pork producer to comply.

21. Additionally, most breeding pigs that will produce hogs sold as meat product in 2022 *are already alive* at Iowa farms. The breeding cycle of the pigs is four months, followed by

4

the piglets being raised for three to four weeks before they are weaned and ultimately, farrow to finish takes approximately 24-26 weeks.

22.     Through Proposition 12, California seeks to unilaterally impose sweeping changes across the national pork production industry, based exclusively on California's preferences. Currently, only a miniscule number of pork producers could satisfy California's onerous standards. Due to the proportion of the national pork supply destined for California—and the significant integration and coordination of national pork production and distribution system—it is neither feasible nor practical for producers to segregate their product from California markets. Not selling to California is not an option.

23.     Proposition 12's confinement restrictions are inconsistent with industry practices and standards, generations of producer experience, scientific research, and the consensus standards of other states. Proposition 12 will impose costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat markets. It will impose enormous costs on Iowa pork producers, ultimately increasing food costs for all Americans, the vast majority of whom had no say in Proposition 12.

24.     Proposition 12's assertion that non-compliant pork meat "threatens the health and safety of California consumers, and increases the risk of foodborne illness" is not correct and is inconsistent with scientific studies surrounding housing breeding sows in group pen settings.

25.     Economic research indicates implementation of Proposition 12 will actually have *adverse* fiscal impacts on residents in California. California residents comprise a large market of pork consumers who will face higher pork prices following implementation of Proposition 12. Thus, any alleged negative fiscal impact that led to the passage of Proposition 12 lacks support.

26.     Currently in the United States, an estimated 42 million people may experience food insecurity in 2021. Pork ranks third in the United States for meat consumption. Proposition 12 threatens to significantly increase the cost of pork for consumers, which will make it even more difficult for economically-distressed families and those already facing food insecurity to afford this critical source of protein.

27.     Proposition 12 also threatens the public supply of pork within California, which is necessary to satisfy the needs of hospitals, schools, and prisons. Without adequate pork supply, these institutions are threatened irreparably.

28.     Further, Iowa pork producers are faced with downstream adverse effects whereby pork packers face immediate suspension from fulfillment of federal contracts.  Worse yet, these packers or distributors face potential federal debarment of governmental contracts if they are unable to satisfy their contracts to supply these public institutions in California.

29.     Many Iowa pork producers have contracts with packers who are awarded federal contracts to provide pork to these California public institutions, and Proposition 12 threatens the ability for these producers to continue to comply with their contractual requirements to supply pork, where they cannot comply with Proposition 12 in time.

30.     If these producers fail to satisfy these contracts, they may create their own contractual liability with packers who face debarment from federal contracts and be excluded from all federal contracts, causing irreparable harm. Many of these producers rely on these federal contracts as a significant source of income.

31.     Without immediate and permanent injunctive relief from this Court, Proposition 12 will unconstitutionally and irreparably injure Iowa pork producers, their livelihoods, and their property.

## PARTIES, JURISDICTION, AND VENUE

32.     Plaintiff Iowa Pork Producers Association serves as a unified voice for its Iowa pork producer members. It is a grassroots organization that consists of approximately 70 structured county associations across the state, with more than 4,000 affiliated and associate members. Every producer-member, regardless of size, has a voice in IPPA through a county-elected delegate system. IPPA has members in nearly every county within Iowa, including Franklin County. IPPA's members in Franklin County contribute to the nearly 1 million hogs produced annually in Franklin County.

33.     Plaintiff Linn Valley Pigs LLP is an Iowa limited liability partnership with its home office in Jones County, Iowa. It owns and operates a sow gestation and farrowing farm, housing approximately 2,800 sows located in Linn County.  LVP supplies pork that is sold into California and expects to continue to supply pork that is sold into California after January 1, 2022.

34.     Plaintiff Twin Prairie Pork, LLC is an Iowa limited liability company with its home office in Clayton County, Iowa. It owns and operates a sow gestation and farrowing farm, housing approximately 2,233 sows located in Clayton County.  TPP supplies pork that is sold into California and expects to continue to supply pork that is sold into California after January 1, 2022.

35.     Plaintiff New Generation Pork, Inc. is an Iowa corporation with its home office in Clayton County, Iowa.  It owns and operates a sow gestation and farrowing farm, housing approximately 4,058 sows located in Clayton County.  NGP supplies pork that is sold into California and expects to continue to supply pork that is sold into California after January 1, 2022.

36.     Defendant Bonta is the Attorney General of the State of California.  Bonta is responsible for the enforcement of Proposition 12 and is sued in his official capacity only.

37.     Defendant Ross is the Secretary of the California Department of Food and Agriculture, which is responsible for implementation of Proposition 12.  Ross is sued in her official capacity only.

38.     Defendant Aragon is the Director of the California Department of Public Health, which is responsible for implementation of Proposition 12.  Aragon is sued in his official capacity only.

39.     This Court has jurisdiction over the subject matter identified in Plaintiffs' Petition pursuant to Article V, Section Six of the Iowa Constitution.

40.     The Court has authority to enjoin enforcement of Proposition 12's sales ban under 42 U.S.C. § 1983, to grant preliminary and permanent injunctive relief, declaratory relief pursuant to Iowa common law and the Iowa Rules of Civil Procedure 1.1501 and 1.1502.

41.     This Court has jurisdiction over Defendants because their unconstitutional and tortious acts and omissions were aimed at Iowa, where a significant amount of the nation's pigs for pork production are located and confined, with knowledge that harm will primarily be felt by Iowa pork producers and primarily impact property located within Iowa.

42.     Venue is proper under Iowa Code § 617.3 because Defendants committed tortious actions which have or will produce injury in Iowa, including to property and persons located within Franklin County, with knowledge that significant harm would be felt in Iowa.

## BACKGROUND ON PROPOSITION 12

43.     In 2008, California passed Turn Around Requirements on California pork producers via ballot initiative, Proposition 2. These restrictions require that breeding pigs (sows) in California must be housed in a manner that permits the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions.

8

44. The limited exceptions as applicable here include only the five-day period prior to expected date of giving birth, during nursing, and for only temporary periods of less than six hours for breeding purposes.

45. Proposition 2 gave California pork producers *more than six years* to comply with Propositions 2's Turn Around Requirements, with an effective date of January 1, 2015.

46. If they wished to comply, California pork producers were required to spend millions of dollars for changes to their facilities.

47. Iowa produces more than one hundred and fifty times the amount of pork by weight than California—with California's pork production at approximately 35 million pounds and Iowa's at 12 *billion*.

48. Proposition 2 also applied to egg-laying hens and calves raised for veal.

49. The California Legislature recognized that out-of-state producers were at an advantage within the California market and thus enacted Assembly Bill 1437 ("AB1437") with the protectionist intent of leveling the playing field and imposing California's confinement requirements for egg-laying hens on out-of-state producers as well.

50. AB1437 did *not* apply to pork meat.

51. After AB1437 passed, California and nationally-sponsored activists proposed Proposition 12, drafted and primarily sponsored by the Humane Society of the United States, which would, like AB1437, regulate pork produced outside of California and, for the first time, subject out-of-state pork producers to California's Turn Around Requirements for breeding pigs if the producer, business owner, or operator desired to sell whole pork meat into or within California.

52. Proposition 12 prohibits the sale of whole pork meat from any breeding pig and its immediate offspring that was confined in a manner inconsistent with Proposition 12's Turn Around

Requirements. This means that for the first time, to sell pork in California, out-of-state producers would be subject to the Turn Around Requirements. Because California producers were already required to comply with the Turn Around Requirements since the passage of Proposition 2, Proposition 12 targeted and applied Turn Around Requirements only for *out-of-state* producers.

53. Thus, Proposition 12 unquestionably directly and intentionally targeted out-of-state activity, both through the confinement requirements and by stifling interstate commerce through the prohibition of sale of non-compliant pork meat into and within California.

54. Multiple statements by the sponsors of Proposition 12 confirm that Proposition 12 was *intended* to reach out-of-state production and that the drafters and sponsors of Proposition 12 were aware of its extra-territorial effects.

55. For example, in an editorial supporting Proposition 12 sponsored by a committee of the Humane Society, activists noted that California does not have a sizeable pork industry and that the proposition would ban sales from out-of-state producers who did not comply with California restrictions. "Editorial: Vote Yes on Prop. 12 to Give Farm Animals a Cage-Free Life," Mercury News (September 4, 2018), https://perma.cc/45Y7-WVFX.

56. Proposition 12's sponsors confirmed that it would impact out-of-state producers by forcing those outside of the state to come into compliance with California's "historical" standards to continue to sell pork in the California market. *See, e.g.*, Charlotte Simmonds, "'History in the Making': California Aims for World's Highest Farm Animal Welfare Law", *The Guardian* (March 7, 2018), https://perma.cc/6RL3-99ZL (The vice-president of farm animals protection for HSUS claims that Proposition 12 "is history in the making"); Anna Keeve, "Farm Animal Rights Bill, Proposition 12: Everything You Need to Know", *LA Progressive* (August 30, 2018), https://perma.cc/6G64-AHUZ, (Humane League activist states that Proposition 12 "has the

potential to be the biggest legislative victory for animals in history, not just in the state but in the country"); *see also* Nicole Pallotta, "Wins for Animals in the 2018 Midterm Election", *Animal Legal Defense Fund* (January 5, 2019), https://perma.cc/J7T5-98XP (Proposition 12 is "being called the strongest law of its kind in the world").

57.     These and other statements demonstrate that not only does Proposition 12 directly target and impact out-of-state commerce, such improper extra-territorial effects were intended.

58.     Further, another motive behind the passage of Proposition 12 was to protect and benefit California in-state producers by imposing scrupulous new standards on out-of-state producers with less, and insufficient, time to comply.

59.     California voters passed Proposition 12 on November 6, 2018. It amended California Health and Safety Code Section 25990, enacted through the passage of Proposition 2, to prohibit the sale of any whole pork meat where the business owner or operator knows or should know is the meat of a breeding pig, or the immediate offspring of a breeding pig, who was confined "in a cruel manner."

60.     Proposition 12 imposes criminal penalties on any person found to be in violation of any provisions of the Act, with penalties of a fine of up to $1,000 or 180 days imprisonment.  These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of non-compliant pork meat within California.  Additionally, the sale of non-compliant pork meat qualifies as an unfair business practice under California law, and violators are separately subject to a $2,500 fine per violation under the state Consumer Protection Act.

61.     The Consumer Protection Act permits the California attorney general, local prosecutors, and even any person, to file a lawsuit to enforce the provisions of the chapter.

62.     Proposition 12 is vague in that it does not specify precisely what qualifies as a violation of the chapter (e.g. each sale, each piece of meat, or each breeding pig).

63.     California recognized that Proposition 12 was facially vague by design, as its very terms mandated that the Department of Food and Agriculture and the State Department of Public Health jointly promulgate rules and regulations for the implementation of this act by September 1, 2019.

64.     To date, just months prior to the 24 square foot restrictions' effective date, and well after the arguable effective date of the Turn Around Requirements, California has failed to even publish *draft* regulations for public hearing, let alone promulgate rules and regulations for the implementation of Proposition 12.

65.     The Turn Around Requirements are arguably already in effect, and the 24 square foot restrictions will take effect on January 1, 2022.

66.     Under the plain text of Proposition 12, a variety of sales prohibitions could apply from the same breeding pig:

- If a breeding pig is currently confined contrary to the Turn Around Requirements, any immediate offspring of that breeding pig cannot arguably be sold into or within California.

- If a breeding pig's confinement meets the Turn Around Requirements but does not meet the 24 square foot restrictions after January 1, 2022, any immediate offspring of that breeding pig cannot be sold into or within California after December 31, 2021.

- However, that same immediate offspring of that breeding pig identified in the second example *could* be sold if the breeding pig is harvested on December 31,

12

2021, because that breeding pig will no longer be confined contrary to Proposition 12 and thus the meat will not be the immediate offspring of a sow confined inconsistent with Proposition 12 after December 31, 2021.

67.     It is not commercially feasible, or perhaps even possible, for Iowa pork farmers to comply with Proposition 12 by January 1, 2022.

## IMMEDIATE IMPACTS OF PROPOSITION 12 ON
## THE IOWA PORK PRODUCTION INDUSTRY

68.     Sows are female pigs held for breeding and give birth to the piglets that ultimately become hogs sent to market. Sows are usually maintained on sow-specific farms that are commonly separated from other hog facilities, to prevent the spread of disease, for the safety of the sows, and to increase efficiency. Sows are generally artificially inseminated, litters of piglets are born, and the piglets are raised for three to four weeks before they are weaned.

69.     An overwhelming majority of sow farms use some type of indoor confinement for sow operations, utilizing the benefit of year-round production and protection from seasonal weather changes, disease exposure, and external predators.

70.     Only a small portion of the pigs that are harvested for meat are sows that have been kept to reproduce.

71.     Pursuant to decades of scientific research, industry practice is that nearly all producers house pregnant sows in individual stalls for insemination, throughout pregnancy, and for the first 30 to 40 days after weaning. This practice helps prevent pregnancy loss, critically permits the attachment of embryos, and guards against the high risk of loss of pregnancy caused by aggressive behavior that commonly occurs within larger pens or open/group housing.

72.     The individual stalls also permit sows to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized nutrition at a time when they are vulnerable.

73.     Specifically, housing sows in individual stalls permits producers to carefully provide each sow with the right amount of feed to achieve optimal nutrition. This is difficult in a group housing system and is especially critical to maintain the appropriate body condition right after weaning.

74.     Housing sows in a group pen also threatens worker safety, given the large size of the animals and the need for farm hands to enter the pens with multiple 400-pound animals.

75.     Proposition 12 imposes restrictions that are contrary to current time-tested, science-based, best practices for pork production. Proposition 12, in practical effect, bans the use of individual stalls during breeding and most of the gestation period.

76.     Further, one interpretation of Proposition 12 means that, after December 31, 2021, Proposition 12 requires that each breeding sow must be allotted at least 24 square feet of usable floor space in the group pen, per pig, subject to limited exceptions.

77.     The offspring of sows are raised to market weight in separate, specialized production facilities, including: (1) feeder pig producers or nurseries; (2) feeder pig finishers; and (3) farrow-to-finish operations. Farrow to finish takes approximately 24-26 weeks.

78.     Once hogs reach harvest weight, they are sent to packing facilities throughout the country. Packing facilities receive hogs from multiple farms, in multiple locations, operated by multiple producers.

79.     A packing facility typically harvests thousands, or even tens of thousands, of hogs daily. Packers process the harvested pigs into whole pork cuts or send them to separate processing

facilities. The meat is packed and delivered to wholesale or to large retail customers throughout the entire country and abroad.

80.     Pork product from one hog is cut into many different cuts of meat and shipped to many end users across the country and internationally.

81.     Thus, it is not currently possible to segregate only the pork meat that will ultimately make it to the California market, because packing facilities receive meat from producers nationally, and each hog is cut into many different cuts of meat.

82.     Further, this means that it would be impossible for certain producers to forego the California market because packing facilities cannot track which hogs came from producers complying with Proposition 12. Packing facilities cannot realistically track meat that should go to California, just as it cannot track which meat should *not* go to California. Practically speaking, this means that production facilities will need to obtain either all Proposition 12-compliant meat or stop providing pork to California.

83.     Proposition 12 confinement restrictions would require significant changes to the vast majority of pork production operations throughout Iowa, including significant structural changes and the requirement to either purchase more land (which may not be available) or reduce the number of pigs at the facility (which would require wasteful harvest of pigs). At this time, only a miniscule portion of sows in the United States are confined in a manner consistent with Proposition 12.

84.     Proposition 12 will also create negative impacts on the sows that are confined within a group pen, likely resulting in significant health risks and piglet loss.

85.     Compliance with Proposition 12 requires significant and extremely costly changes to the farming operations of Iowa's pork producers, including IPPA's members and individual Plaintiffs.

86.     Group confinement requirements mandated by Proposition 12 create significant ongoing harm to breeding sows.  Sows are subject to physical aggression, abuse, losing fetuses in utero, lameness and the inability to obtain proper nutrition when confined in group systems.

87.     It will be an actual impossibility for many members to ever come into compliance with Proposition 12 requirements for a variety of reasons, including lack of space, financial inability, or lack of permits to build new barns or retrofit barns. It is expected that smaller pork producers will be those unable to comply with Proposition 12, pushing smaller producers, which are often family farms, out of the industry. This will result in a consolidation of the industry into large producers and will significantly harm many small producers located in Iowa.

88.     Small farm operations are already threatened by bigger producers and small producers have been on the decline for the last twenty-five years. *See* Table, *2020 Iowa Pork Industry Report*, May 2020, 21:



**Figure 18, Number of Iowa Hog Operations by Size (1997-2017)**

89.     Producers cannot realistically forego the California market, as the California market makes up 13-15% of the nation's pork consumption market. If forced to exit the California market, many farmers' operations will become cost prohibitive based on loss in revenue from California consumers. Any increased price of pork in California will not be sufficient to offset the cost to come into compliance with Proposition 12. This is because it is impossible to segregate which portions of meat will be sold into the California market alone.

90.     For the minority of producers who may be able to come into compliance, it is estimated that it will cost these producers approximately $15-23 more per hog to comply with Proposition 12, which will ultimately be passed on to consumers nationwide.

91.     Or, alternatively, to come into compliance, many producers will need to limit their supply so that their pigs will have more space, as many do not have the option to buy more real estate. This means that the national pork supply will drop.

92.     For every one percent reduction in pork supply, a 2.5% price increase will impact the national pork market. Again, this will ultimately translate to an increased cost to consumers nationwide.

93.     Even if producers were able to forego the California market, there would be drastic impacts on the nationwide pork industry and further irreparable harm to small pork producers. The remaining nation would need to absorb the additional supply of pork, which would result in a 25% reduction in farm receipts. Again, the smaller producers are most threatened, likely unable to sustain the losses and would be forever forced out of the market.

94.     Thus, Plaintiffs face immediate and irreparable harm if Proposition 12 goes into effect as planned. Injunctive relief will remedy this harm.[1]

## **STANDING**

95.     IPPA brings this suit on behalf of the entity and its members.  IPPA and its members have suffered, and will continue to suffer, concrete and particularized injuries that are a direct result of Proposition 12. Their injuries will be redressed by a decision of this Court.

96.     IPPA has associational standing to challenge Proposition 12 on behalf of its members and on behalf of the entity itself.

97.     One or more IPPA members has standing to bring this action in their own right. Thousands of IPPA members are directly subject to Proposition 12 because they breed or raise pigs that are being sold into and within California.

98.     The issues addressed in this action are germane to IPPA's mission statement.

99.     Individual participation by IPPA members is not required for this action.

---

[1] Plaintiffs will separately file an Application for Temporary and Permanent Injunction following service on Defendants.

100.    LVP, TPP and NGP are entities which supply pork to be sold into and within California, and expect to continue to do so after January 1, 2022.

101.    The vast majority of Iowa pork producers are currently raising pigs that do not meet Proposition 12's requirements.

102.    Iowa pork producers cannot realistically change the confinement of these breeding pigs to come into compliance with Proposition 12's 24 square foot restrictions as required on or before December 31, 2021.

103.    In California, meat cannot be sold if it comes from a breeding pig that remains in confinement contrary to Proposition 12.

104.    Plaintiffs thus face imminent and irreparable harm of either being forced to harvest their breeding pigs in order to enter the California market, which makes up 13-15% of the national market, ceasing operations, or being forced to forego one of the largest pork consumption markets in the nation at crippling expense (which may not even be possible).

105.    Further, the entire national market for pork is threatened to be irreparably harmed if Proposition 12 goes into effect, with impacts on nationwide consumers who had no involvement in the passage of Proposition 12.

106.    These injuries will be remedied by the relief sought in this action.

## COUNT I – VIOLATION OF THE COMMERCE CLAUSE (42 U.S.C. § 1983)

107.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-106 as though fully set forth herein.

108.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Commerce Clause at Article I, Section 8 of the United States Constitution.

109.  California enacted Proposition 12 on November 6, 2018, which, for the first time, prohibits business owners and operators from engaging in the sale of whole pork meat from animals confined in a cruel manner, regardless of where the animal was confined.

110.  Prior to the passage of Proposition 12, pork producers within California were already subject to the Turn Around Requirements through the enactment of Proposition 2.

111.  Thus, Proposition 12 directly and intentionally targets non-California producers by subjecting them to the onerous Turn Around Requirements and additional 24 square foot restrictions in order to sell pork to and within California.

112.  Proposition 12 is a protectionist trade barrier with a discriminatory intent which was designed to protect in-state pork producers and burden out-of-state producers to create a nationwide regulation to satisfy California. Proposition 12 was designed to take away an economic advantage that out-of-state pork producers had by not being required to comply with the Turn Around Requirements.

113.  Proposition 12 unlawfully favors in-state pork producers, who had been subject to confinement standards since 2008, by giving them an advantage in the California market to continue to sell pork while having a significantly longer time to come into compliance with the Turn Around Requirements.

114.  Further, Proposition 12 unfairly burdens out-of-state pork producers by giving them significantly less time to change their confinement practices prior to when the ban of the sale of meat goes into effect, and by forcing them to conform their entire production practices in order to satisfy a single state.

115.  Proposition 12 unconstitutionally targets extra-territorial conduct. Because prior legislation already subjected in-state producers to the Turn Around Requirements, the only purpose

of Proposition 12 was to directly target out-of-state producers by imposing the Turn Around Requirements immediately.

116.    Proposition 12 has indirect impacts on out-of-state commerce in a manner that wholly regulates conduct extra-territorially. If Proposition 12 goes into effect, it will have an impact on the national market of pork production, including: decreasing supply, forcing small pork producers out of the market, consolidating pork production into large producers, altering sales in all remaining states to conform to Proposition 12 confinement standards, altering packers' practices to conform to Proposition 12 confinement standards, and ultimately resulting in nationwide increases in the costs of pork meat that will be passed along to consumers nationwide.

117.    Proposition 12 further has a direct impact on the public supply of pork to California schools, hospitals, prisons and other federal and state institutions. These institutions rely on pork from out-of-state producers through federal contracts.

118.    The inability of producers who supply pork meat to satisfy these federal contracts to come into compliance with Proposition 12 will result in a direct impact to the packers' ability to fulfill the federal contracts, including possible risk of immediate suspension of contract fulfillment and debarment from federal contracts.

119.    The ultimate result will be that the small producers who may have helped provide pork supply for the federal contracts, will be forced to lose significant subcontracts that are available for those who subcontract with the federal contractors.

120.    California does not have a legitimate interest in regulating activity that occurs wholly outside of California. Further California's purported legitimate interest in Proposition 12, "food safety," is not served by the enforcement of Proposition 12, because these confinement

requirements do not impact the safety of the final meat product consumed by California residents, or worse, impact food safety negatively.

121.    These burdens on commerce, which impact all stages of the pork production market, clearly outweigh any local benefit—which benefit does not exist.

## COUNT II – VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983) (FACIAL CHALLENGE)

122.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-121 as though fully set forth herein.

123.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

124.    Proposition 12 violates the Due Process Clause because it is unconstitutionally vague on its face and criminalizes behavior without giving individuals of ordinary intelligence a reasonable opportunity to know what conduct is prohibited, so that they may act accordingly.

125.    Unlike other agricultural regulatory statutes, Proposition 12 is a criminal statute. The text of Proposition 12 provides that "any person who violates any of the provisions of this chapter is guilty of a misdemeanor" and subjects those persons upon conviction to a fine of up to $1,000 or by imprisonment for a period not to exceed 180 days.

126.    California passed Proposition 12 on November 6, 2018. Proposition 12 went into effect shortly thereafter, on December 19, 2018, as the California Constitution Article II, Section 10 provides that unless a statute otherwise specifies a date, a ballot initiative "takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date."

127.    Proposition 12's Turn Around Requirements do not have a separately specified effective date in the text and thereby arguably went into effect on December 19, 2018.

128.    Proposition 12's 24 square foot restrictions' effective date is specified and goes into effect "after December 31, 2021."

129.    Proposition 12 also violates the Due Process Clause because it does not provide out-of-state producers adequate notice or time to have a reasonable opportunity to know what conduct is prohibited prior to the effective date of the requirements.

130.    The text of Proposition 12 does not clearly define what qualifies as a "violation" under the chapter. The text of Proposition 12 also does not clearly define *when* the violation subject to criminal liability occurs or *who* throughout the supply chain can be criminally prosecuted. Proposition 12 also potentially criminalizes behavior of an individual at the beginning of the production chain based on decisions and actions by those further in the production chain.

131.    Proposition 12 lacks sufficient definiteness and specificity to provide those persons of ordinary intelligence who may be subject to the law a reasonable opportunity to know what conduct is criminalized and what punishment applies.

132.    California recognized that Proposition 12 was facially vague and failed to give individuals of ordinary intelligence a reasonable opportunity to know what conduct is prohibited and required in the statute that the Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019.

133.    Proposition 12 allows for arbitrary, inconsistent, and discriminatory enforcement by Defendants.

134.    Under Iowa law, Plaintiffs have a protectable interest in their property, including their breeding pigs, and a constitutional right to liberty to be free from the consequences of criminal prosecution from the enforcement of a facially vague law.

## COUNT III – VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983) (FAILURE TO PROMULGATE THE RULES AS MANDATED)

135.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-134 as though fully set forth herein.

136.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

137.    Proposition 12 violates the Due Process Clause because it criminalizes behavior and California failed to promulgate the rules as the statute required. California and Proposition 12 failed to give individuals of ordinary intelligence a reasonable opportunity to know what conduct is prohibited, so that they may act accordingly.

138.    California passed Proposition 12 on November 6, 2018. Proposition 12 went into effect shortly thereafter, on December 19, 2018, as the California Constitution Article II, Section 10 provides that unless a statute otherwise specifies a date, a ballot initiative "takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date."

139.    Proposition 12's Turn Around Requirements do not have a specified effective date in the text and thereby arguably went into effect on December 19, 2018.

140.     Proposition 12's 24 square foot restrictions' effective date is specified and goes into effect "after December 31, 2021."

141.     Unlike other agricultural regulatory statutes, Proposition 12 is a criminal statute. The text of Proposition 12 provides that "any person who violates any of the provisions of this chapter is guilty of a misdemeanor" and subjects those persons upon conviction to a fine of up to $1,000 or by imprisonment for a period not to exceed 180 days.

142.     Proposition 12 mandated that "the Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019."

143.     The Department of Food and Agriculture and the State Department of Public Health failed to promulgate the rules as of the date of this filing.

144.     The arguable December 19, 2018 effective date for the Turn Around Requirements did not allow for any time for the promulgation of the rules. The vast majority of whole pork meat sold into California is currently not in compliance with this provision, placing those supplying the state's pork demand at risk for criminal prosecution.

145.     The January 1, 2022, effective date for the 24 square foot restrictions is just months away without even the officially proposed draft rules posted and available for public comment, let alone the final promulgation of the rules. Producers do not have time to comply with this provision either. Due to the breeding cycle, sows that are currently pregnant are the source of the pork that will be sold after January 1, 2022. California can, and plans to, begin enforcement of this provision on January 1, 2022, even though California has failed the promulgate Proposition 12's mandated rules for compliance.

146.    Despite the failure to promulgate the rules, the Animal Care Program (ACP), which was formed to implement Proposition 12, and is a new program within the Animal Health and Food Safety Services division of the California Department of Food and Agriculture, informed the public that "with the respect to a delay in enforcement, ACP does not have authority to extend the compliance deadlines provided for in the statute established under Proposition 12 for covered animals and covered products."

147.    Due to California's failure to promulgate the rules as mandated by Proposition 12, and due to the length of time involved in the breeding cycle for sows and the time from farrowing to finish for pork processing, a person of ordinary intelligence does not have sufficient notice of or time to comply with either the Turn Around Requirements arguably effective now or the 24 square foot restrictions effective on January 1, 2022.

148.    As a result of California's failure to promulgate the rules as mandated by its own ballot initiative passed by its citizens, California's Proposition 12 lacks sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or provide persons of ordinary intelligence a reasonable opportunity to know what conduct is criminalized and therefore has failed to put individuals of ordinary intelligence on notice of what constitutes a violation of the statute.

149.    Proposition 12 allows for arbitrary, inconsistent, and discriminatory enforcement by Defendants.

150.    Under Iowa law, Plaintiffs have a protectable interest in their property, including their breeding pigs, and a constitutional right to liberty to be free from the consequences of criminal prosecution from the enforcement of a facially vague law.

**COUNT IV – VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (42 U.S.C. § 1983)**

151.     Plaintiff IPPA incorporates the facts set forth in Paragraph Nos. 1-150 as though fully set forth herein.

152.     Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against IPPA individual members, including by violating these individual members' rights under the Privileges and Immunities Clause at Article IV, Section 2 of the United States Constitution.

153.     Article IV, § 2 of United States Constitution states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

154.     The right to pursue a common calling, such as to pursue a trade, practice an occupation, or pursue a common calling within the state is a fundamental right protected by the Privileges and Immunities Clause.

155.     Prior to the passage of Proposition 12, pork producers within California had already been subject to the Turn Around Requirements since 2015 through the enactment of Proposition 2.

156.     Proposition 12 was passed on November 18, 2018, and for the first time targeted out-of-state producers by subjecting them to the onerous Turn Around Requirements and additional 24 square foot restrictions in order to sell pork into and within California.

157.     Proposition 12 discriminates against out-of-state producers by immediately prohibiting the sale of whole pork within California that does not comply with the Turn Around Requirements, without providing out-of-state producers with the same six years to come into compliance with these Turn Around Requirements that was afforded to in-state producers.

158.     Proposition 12 thus serves as a proxy for differential treatment and discriminates in practical effect against out-of-state producers.

159.     Proposition 12 was designed to take away an economic advantage that out-of-state pork producers had by not being required to comply with the Turn Around Requirements. Proposition 12 favors in-state pork producers, who had been subject to Turn Around Requirements since January 1, 2015, and on notice of the Turn Around Requirements since 2008, by giving them an advantage in the California market to continue to sell pork while having a significantly longer time to come into compliance.

160.     Proposition 12, on its face, does not delay the enforcement of the Turn Around Requirements for breeding pigs or their offspring sold within California to out-of-state producers.

161.     Accordingly, Proposition 12 provided *no* time for out-of-state producers to come into compliance with the Turn Around Requirements allowed to in-state producers.

162.     Sufficient justification does not exist to discriminate against out-of-state producers.

## COUNT V – PREEMPTION BY PACKERS AND STOCKYARDS ACT (42 U.S.C. § 1983)

163.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-162 as though fully set forth herein.

164.     Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

165.     The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law.

166.     A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

167. California enacted Proposition 12 on November 6, 2018, which prohibits the sale of meat by any business owner or operator from an animal that was not confined in accordance with Proposition 12.

168. California pork producers have been on notice since 2008 that they will need to come into compliance with the Turn Around Requirements.

169. Out-of-state pork producers are unable to come into compliance and thus will not be able to sell their meat into or within the California market.

170. Proposition 12 therefore requires business owners and operators engaged in the sale of meat to favor in-state producers who were allowed six years to come into compliance with Proposition 2 Turn Around Requirements.

171. This favoritism toward California producers will create unfair competition with out-of-state producers, potentially regardless of the price of meat.

172. The Packers and Stockyards Act, 7 U.S.C. § 192(b) prohibits any wholesaler of meat from providing any preference to a particular locality and from subjecting any particular locality to a "disadvantage" in the sale of meat.

173. Proposition 12 directly requires wholesalers to favor in-state pork producers and to disadvantage the out-of-state pork producers who have not had as much time to come into compliance with the Turn Around Requirements and now, the 24 square foot restrictions.

174. Thus, it is impossible for a wholesaler to comply with both Proposition 12 and the Packers and Stockyards Act.

175. Further, the Packers and Stockyards Act prohibits wholesalers from taking action that will result in a restraint on Trade, 7 U.S.C. §§ 192 (c)-(e).

176.    By refusing to sell meat from animals that were not confined in accordance with Proposition 12, wholesalers will be engaged in conduct that restrains trade based on the impacts on interstate commerce in the pork industry. These impacts include forcing small businesses out of the market, passing along increased costs to consumers, and reducing the supply of pork meat in the market.

177.    Thus, it is impossible for a wholesaler to comply with both Proposition 12 and the Packers and Stockyards Act.

178.    Alternatively, Proposition 12 creates hurdles to comply with the Packers and Stockyards Act.

179.    Proposition 12 is therefore preempted by the Packers and Stockyards Act.

## COUNT VI – VIOLATION OF THE EQUAL PROTECTION CLAUSE (42 U.S.C. § 1983)

180.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-179 as though fully set forth herein.

181.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

182.    Proposition 12 violates the Equal Protection Clause because it is not rationally related to any legitimate state purpose.

183.    California passed Proposition 12 on November 6, 2018, to address a purported interest in protecting health and safety of California consumers.

184.    Proposition 12 does not impact the health or safety of California consumers because confinement of breeding pigs does not impact the safety of the meat product.

185.    Proposition 12 further distinguishes between "whole pork meat" and "combination pork product" despite the fact the combination pork meat comes from the same hogs which contain the whole pork meat.

186.    This distinction bears no rational relationship to any legitimate state interest in health, safety, or welfare.

187.    Further, pork producers will be unable to track which animals will be used for combination food products and which will be used for whole meat product.

188.    Proposition 12 also is underinclusive by creating an exception of individual stalls only for actual insemination, and five days prior to birth and not for the duration of pregnancy which is the most critical time for individual confinement.

189.    This distinction bears no rational relationship to any legitimate state interest in health, safety, or welfare.

190.    California's only interest is the economic protection of in-state producers, which is not a legitimate state interest.

191.    Proposition 12 serves no relation to a legitimate state interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court set this matter for hearing on a preliminary injunction following review of Plaintiffs' separate Application for Temporary and Permanent Injunction, and award the following relief:

1.    Issue a preliminary and permanent injunction prohibiting the Defendants, employees and agents, and all persons acting under their direction from enforcing Proposition 12, its policies, practices and customs;

2.    Enter judgment declaring that Proposition 12 and related policies, practices and customs of the Defendants violate the United States Constitution and may not be lawfully enforced, both now and in the future;

3.    Grant Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and,

4.    Any further relief that the Court deems just and equitable.

Dated: May 24, 2021.

IOWA PORK PRODUCERS ASSOCIATION, LINN VALLEY PIGS, LLP, TWIN PRAIRIE PORK, LLC, and NEW GENERATION PORK, INC., Plaintiffs.

By: */s/ Ryann A. Glenn*
Marnie A. Jensen (*pro hac vice* forthcoming)
Ryann A. Glenn (AT0010530)
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone:  (402) 964-5000
Facsimile:  (402) 964-5050
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com
*Attorneys for Iowa Pork Producers Association*

and

Eldon L. McAfee (AT0004987)
Julie L. Vyskocil (AT0009711)
Erin C. Herbold (AT0008933)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 271-5916
Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com
julie.vyskocil@brickgentrylaw.com
erin.herbold@brickgentrylaw.com

*Attorneys for Iowa Pork Producers
Association, Linn Valley Pigs LLP, Twin
Prairie Pork, LLC, and New Generation
Pork, Inc.*